**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
NORTHWESTERN DIVISION**

| | | |
|---|---|---|
| Deadwood Canyon Ranch, LLP, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER DENYING PLAINTIFF'S** |
| | ) | **MOTION FOR PARTIAL SUMMARY** |
| vs. | ) | **JUDGMENT AND GRANTING** |
| | ) | **DEFENDANT'S MOTION FOR** |
| Fidelity Exploration and Production Company, | ) | **PARTIAL SUMMARY JUDGMENT** |
| | ) | |
| | ) | Case No. 4:10-cv-081 |
| Defendant. | ) | |

___

Before the Court are cross-motions for partial summary judgment. See Docket Nos. 13 and 21. The Court denies the Plaintiff's motion for partial summary judgment, and grants the Defendant's motion for partial summary judgment on the breach of contract claim.

**I.    BACKGROUND**

The plaintiff, Deadwood Canyon Ranch, LLP ("DCR"), has three principal partners which include Stuart Pratt, Charles Steele, and the David Richards Children Trust - 1977 (for which David Richards is the trustee). In 2006, DCR purchased property in Mountrail County, North Dakota. The defendant, Fidelity Exploration and Production Company ("Fidelity"), owns the mineral rights to the property.

In 2009, Fidelity contacted DCR regarding a plan to drill oil wells on the property. On September 2, 2009, Fidelity sent DCR a "Notice of Drilling Operations" which is a standard 20-day notice of its intention to drill three wells known as 44-32H, 11-33H, and 44-34H. See Docket Nos. 14-28, 14-29, and 14-30. The notices contained Fidelity's proposed agreements for damages associated with drilling and oil production. Fidelity offered a one-time payment ranging between

$8,000.00 and $14,500.00 for surface damages associated with constructing access roads and the three wells sites. Fidelity also offered a one-time payment of $18,000 per well to be paid if the well became a commercial producer of oil. See Docket Nos. 14-28, p. 8; 14-29, p. 8; and 14-30, p. 8.

On September 15, 2009, David Richards, on behalf of DCR, signed the receipt of the "Notice of Drilling Operations." See Docket Nos. 14-31, p. 4; 14-32, pp. 4-5; and 14-33, p. 1. Richards also signed the proposed agreements concerning a one-time payment for surface damages. Each of the agreements also contained an offer of a payment of $18,000 per well. Richards signed one of the three offers and accepted the payment of $18,000 if well 44-32H became a commercial producer of oil. See Docket No. 14-31, p. 2. However, Richards modified several other documents contained within Fidelity's proposal.

Specifically, Richards modified Exhibit B which contained conditions concerning the impact of the oil activity for all of the proposed wells. See Docket Nos. 14-31, p. 3; 14-32, p. 2; 14-33, p. 4. Richards also modified "Exhibit A" for wells 11-33H and 44-34H, specifically changing the offered price of $18,000 per well to $1,500,000 per well if the wells became commercial producers of oil. See Docket Nos. 19-1 (original for well 11-33H); 19-2 (original for well 44-34H); 19-3 (modified for well 11-33H); 19-4 (modified for well 44-34H). Richards signed the modified documents and the unmodified documents, and returned all of the documents to Fidelity. Although Richards and other partners of DCR communicated with Fidelity after Richards returned the modified documents, it is undisputed that DCR did not explicitly notify Fidelity of the significant modifications to the compensation to be paid. See Docket No. 14-4, pp. 33-40. As noted, Richards changed the compensation to be paid from $18,000 per well to $1.5 million dollars per well.

2

On September 17, 2009, Dennis Zander, Fidelity's Regional Operations Manager, received the documents or agreements from Richards. See Docket No. 14-34. On the same day, Scott Kemmis, a Fidelity landman, also acknowledged receiving the signed documents from Richards. Kemmis sent an email to David Richards that stated as follow:

> David,
>
> I stopped by the Glendive Fidelity office this morning before leaving town for a few days (30th anniversary).
>
> We received the signed documents for the 3 wells that are scheduled for construction and drilling, thank you.
>
> I will get the payment requests processed for next week check run, where would you like the check sent? We show the Bozeman address but if elsewhere let me know.
>
> Sincerely,
> Scott A. Kemmis
> Contract Land Agent
> Fidelity E&P

See Docket No. 14-35.

On September 29, 2009, Fidelity contacted David Richards for permission to survey the property. See Docket No. 14-38. On September 30, 2009, and in accordance with the signed agreements, Fidelity sent DCR checks for surface damage associated with the construction of access roads and the drilling sites for the three oil wells known as 44-32H, 11-33H, and 44-34H. See Docket No. 14-37. On October 1, 2009, Fidelity applied for drilling permits for the wells. See Docket Nos. 14-39; 14-40; and 14-41. Between October 9-12, 2009, Fidelity received the permits to drill the three wells from the North Dakota Industrial Commission. See Docket Nos. 14-39, pp. 3-4; 14-40, pp. 3-4; and 14-41, pp. 3-4.

On October 19, 2009, Scott Kemmis of Fidelity notified David Richards that Fidelity planned to begin "construction this week." See Docket No. 14-44, p. 4. Invoices from an excavating company, Excel Industries, Inc., show work occurred at each of the three wells from October 24, 2009, to November 11, 2009. See Docket No. 14-42. The work at the wells, as described in the invoice, included "[w]ell site excavation," "pit excavation," "[a]ccess road excavation," "[c]ulverts," and installation of cattleguards. See Docket No. 14-42.

On December 18, 2009, Scott Kemmis of Fidelity allegedly noticed for the first time that David Richards had modified Fidelity's proposal. See Docket No. 14-47. On December 21, 2009, Kemmis sent an email to Fidelity employees Jim Kennedy and Dennis Zander. See Docket No. 14-46. On December 23, 2009, counsel for Fidelity sent a letter to Richards requesting that he sign and return a copy of Fidelity's original proposal for damages of $18,000 per well if wells 11-33H and 44-34H became commercial producers of oil. See Docket No. 14-50. Richards did not do so.

On December 25, 2009, Fidelity began to drill the oil well known as 11-33H. See Docket No. 14-51 (showing the "spud" date). On January 23, 2010, Fidelity began to drill the oil well known as 44-34H. See Docket No. 14-52. It is undisputed that both 11-33H and 44-34H became commercial-producing oil wells in 2010.

On October 19, 2010, DCR initiated a lawsuit against Fidelity in state court in Mountrail County, North Dakota. See Docket No. 1-1. DCR alleged in the complaint that Fidelity breached the agreements with DCR and that Fidelity owed DCR the sum of $3,000,000. On November 4, 2010, Fidelity removed the lawsuit to federal district court. See Docket No. 1.

On December 14, 2011, DCR moved for partial summary judgment on the breach of contract claim. See Docket No. 13. DCR alleges that David Richards executed a counteroffer when he

modified Fidelity's offer for damages; that Fidelity's conduct amounted to acceptance of the counteroffer; and that Fidelity owes DCR damages in the amount of $1,500,000 per well or a total of $3,000,000 pursuant to the agreements because the oil wells 11-33H and 44-34H became commercial producers of oil. See Docket No. 14. On January 11, 2012, Fidelity filed a brief in opposition to the motion. See Docket No. 19. On February 3, 2012, DCR filed a reply brief. See Docket No. 26.

On January 11, 2012, Fidelity moved for partial summary judgment on the DCR's breach of contract claim. See Docket No. 21. Fidelity characterizes Richards's modifications as a counteroffer. Fidelity argues there are no facts which support the existence of an agreement because Fidelity timely rejected the counteroffer prior to drilling the wells. On February 3, 2012, DCR filed a responsive brief in opposition to the motion. See Docket No. 26. On February 28, 2012, Fidelity filed a reply brief. See Docket No. 28.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. Davison v. City of Minneapolis, Minn., 490 F.3d 648, 654 (8th Cir. 2007); Fed. R. Civ. P. 56(a). Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party. Id.

### III.   LEGAL DISCUSSION

The Court is sitting in diversity jurisdiction and, therefore, North Dakota substantive law applies. Under North Dakota law, a contract requires an offer, acceptance of that offer, and mutual acceptance and understanding of the offeror and offeree as to the terms of the legally enforceable obligation incurred. Lagerquist v. Stergo, 2008 ND 138, ¶ 15, 752 N.W.2d 168; see also Geostar Corp v. Parkway Petroleum, Inc., 495 N.W.2d 61, 66 (N.D. 1993). In order to form a contract there must be a meeting of the minds between the parties with respect to all of the terms and conditions, and there must be an unqualified and absolute acceptance of an offer by either party. See Davis v. Satrom, 383 N.W.2d 831, 833 (N.D. 1986) (citing Greenberg v. Stewart, 236 N.W.2d 862 (N.D. 1975)); N.D.C.C. § 9-03-21 (requiring acceptance to be absolute). In order to form a contract, the offer and acceptance must express assent to the same thing. Wucherpfennig v. Dooley, 351 N.W.2d 443, 444 (N.D. 1984).

In determining whether there has been an acceptance of an offer, the order of communications is critical to an accurate analysis of the offer, counteroffer, acceptance, modification, and the like. See B.J. Kadmas, Inc. v. Oxbow Energy, LLC, 2007 ND 12, ¶ 14, 727 N.W.2d 270. Both parties agree that David Richards submitted a counteroffer to Fidelity when he modified Fidelity's original proposal for additional compensation in the amount of $18,000 per well. See N.D.C.C. § 9-03-21 ("A qualified acceptance is a new proposal."); Cooke v. Blood Sys., Inc., 320 N.W.2d 124, 128 (N.D. 1982) ("An offer to be considered accepted must be accepted unconditionally. . . . A conditional acceptance of an offer is in itself a counteroffer which rejects the original offer.").

Consent to a contract is only sufficient where the consent is (1) freely given; (2) mutual; and (3) communicated to the other contracting party. N.D.C.C. § 9-03-01. North Dakota recognizes that a party's actions may constitute consent. N.D.C.C. §§ 9-03-20 and 9-20-25 provide as follows:

> **9-03-20. Acts constituting acceptance.** Performance of the conditions of a proposal, or the acceptance of the consideration offered with a proposal, is an acceptance of the proposal.
>
> **9-03-25. Acceptance of benefit equivalent to consent.** A voluntary acceptance of the benefit of a transaction is equivalent to a consent to all the obligations arising from it so far as the facts are known or ought to be known to the person accepting.

N.D.C.C. §§ 9-03-20; 9-03-25. Unless an offer specifically prescribes the method of communicating the consent, "any reasonable and usual mode may be adopted." N.D.C.C. § 9-03-18.

DCR contends that Fidelity's conduct amounted to an acceptance of the new terms. DCR presented evidence which reveals that Fidelity constructed oil well sites, applied for drilling permits, and obtained the drilling permits concerning the wells known as 11-33H and 44-34H. As DCR's counteroffer provides, Fidelity also submitted payments to DCR for the surface damages caused by the construction of the well sites and access roads for 11-33H and 44-34H. In addition, David Richards testified that with respect to oil wells drilled on their property before this dispute, Fidelity did not sign the proposed agreements, but instead, would essentially start to construct the wells and begin drilling after Richards signed the agreements. See Docket No. 14-4, p. 35; N.D.C.C. § 9-03-18 (acceptance of a contract may be carried out by "any reasonable and usual mode").

Fidelity contends that its conduct does not amount to an acceptance of DCR's counteroffer which changed the original offer price of $18,000 per well to $1,500,000 per well if the two wells became commercial producers of oil. Fidelity argues that it was unaware of DCR's counteroffer until December 18, 2009, and promptly rejected the counteroffer on December 23, 2009. Fidelity

7

contends that the rejection was effective because it had not commenced to drill the wells until after the rejection - well 11-33H was drilled on December 25, 2009, and well 44-34H was drilled on January 23, 2010.

The Court finds that Fidelity is entitled to summary judgment on DCR's breach of contract claim because no contract existed between Fidelity and DCR for the payment of additional compensation for wells 11-33H and 44-34H. The undisputed facts establish that Fidelity was unaware of DCR's $1.5 million dollar counteroffers and, therefore, never accepted the counteroffers. Absent an acceptance of DCR's counteroffers, no contract existed between Fidelity and DCR for additional compensation for wells 11-33H and 44-34H.

The uncontroverted facts establish that Fidelity never accepted DCR's counteroffers of $1,500,000 per well. Fidelity sent DCR a twenty-day "Notice of Drilling Operations" for wells 44-32H, 11-33H, and 44-34H, which contained contractual offers of $18,000 per well of additional compensation if the oil well became a commercial producer of oil. DCR accepted the additional compensation of $18,000 for well 44-32H and signed and returned that contract. However, DCR unilaterally altered Fidelity's offers for additional compensation on wells 11-33H and 44-34H. Specifically, DCR retyped the contract to look exactly the same as the original, except DCR increased the additional compensation from $18,000 per well to $1,500,000 per well. The Court finds as a matter of law that this significant and unilateral change in the amount to be paid on a contractual instrument is a material alteration which would not bind a non-consenting party.

The Court finds that DCR had no authority to make a binding offer on behalf of Fidelity to new contract terms of which Fidelity had no knowledge. DCR certainly had a right to make a counteroffer, but it could not significantly alter the original offer of $18,000 per well; increase the

8

offer to $1.5 million dollars per well without Fidelity's knowledge; and then bind Fidelity to the counteroffer when it had no knowledge of the material change in terms of the compensation to be paid. DCR has failed to cite any legal authority to support its position that it had the power to make a unilateral, binding offer on behalf of Fidelity, and then accept its own significantly-increased offer, all unbeknownst to Fidelity. The Court finds as a matter of law that no contract existed between the parties because there clearly was no meeting of the minds.

In addition, Fidelity is entitled to partial summary judgment on DCR's breach of contract claim because there was no mutual consent to the payment of $1,500,000 per well as additional compensation for wells 11-33H and 44-34H. A valid contract requires the mutual consent of the parties. See N.D.C.C. § 9-01-02 (requiring mutual consent of the parties is essential to the existence of a contract). North Dakota law requires that the consent of the parties must be free, mutual, and communicated to each other. See N.D.C.C. § 9-03-01; see also Stout, 1999 ND 218, ¶ 11, 603 N.W.2d 52. Consent is not mutual unless the parties agree upon the same thing in the same manner. N.D.C.C. § 9-03-16; Thompson v. Thompson, 2008 ND 144, ¶ 11, 752 N.W.2d 624; Stout, 1999 ND 218, ¶ 11; Anderson v. Mooney, 279 N.W.2d 423, 426-27 (N.D. 1979).

In determining whether mutual consent existed, the critical issue is whether both Fidelity and DCR agreed to compensate DCR $1,500,000 per well in additional compensation for wells 11-33H and 44-34H if those wells became commercial producers of oil. In deciding whether the parties mutually consent to entering into a contract, the court must look to the actions of the parties both at the time and after the agreement was made. Gulden v. Sloan, 311 N.W.2d 568, 571 (N.D. 1981).

For a valid contract to exist there must be mutual consent, meaning the parties all agree upon the same thing in the same sense. N.D.C.C. § 9-03-16; Thompson, 391 N.W.2d 608 (N.D. 1986).

9

In Thompson, the North Dakota Supreme Court addressed the issue of mutual consent involving a waste-water disposal well. Id. at 611. In analyzing the legal standard for determining mutual consent, the Thompson Court relied on Corbin on Contracts, which stated:

> If the court is convinced that the parties to a transaction gave different meanings to the express terms of the agreement and that neither party knew or had reason to known that fact, the holding will be that no contract was made and neither reformation nor enforcement in accordance with anybody's 'meaning' will be granted.

Id. (citing Corbin on Contracts § 540, p. 88 (1960)). The North Dakota Supreme Court concluded the parties materially differed as to what was being conveyed in the contract. Id. Thus, the Court held there was no contract because the parties did not "agree upon the same thing in the same sense." Id. (citing N.D.C.C. § 9-03-16).

The undisputed facts clearly establish that Fidelity and DCR did not "agree upon the same thing in the same sense." See N.D.C.C. § 9-03-16. Fidelity reasonably believed that DCR agreed to additional compensation of $18,000 per well for wells 11-33H and 44-34H. Fidelity was not informed that DCR had changed the agreements and had made significantly-increased counteroffers in the amount of $1,500,000 per well as additional compensation. DCR claims it believed Fidelity agreed to the additional compensation of $1.5 million dollars per well because Fidelity never rejected the counteroffer. Common sense would lead a reasonable person to conclude otherwise. In situations where the parties to a transaction gave different meanings to the terms of the agreement and neither party knew or had reason to know that fact, the court will hold that no contract was made. See Thompson, 391 N.W.2d at 611 (citing Corbin on Contracts § 540, p. 88; see also Restatement (Second) of Contracts § 20 (1981) (stating there is no manifestation of mutual assent to an exchange if the parties attach materially different meanings to their manifestations and neither

10

party knows the meaning attached by the other). Both Fidelity and DCR assigned a significantly different meaning to the amount of additional compensation to be paid for wells 11-33H and 44-34H. The Court finds as a matter of law that no contract ever existed between the parties as to the amount of additional compensation to be paid for wells 11-33H and 44-34H if those wells became commercial producers of oil.

The Court notes that DCR is not left without a remedy. Chapter 38-11.1 of the North Dakota Century Code provides for compensation to surface owners for damage related to oil and gas production. N.D.C.C. § 38-11.1-04 states, in pertinent part:

> The mineral developer shall pay the surface owner a sum of money equal to the amount of damages sustained by the surface owner and the surface owner's tenant, if any, for loss of agricultural production and income, lost land value, lost use of and access to the surface owner's land, and lost value of improvements caused by drilling operations. The amount of damages may be determined by any formula mutually agreeable between the surface owner and the mineral developer. When determining damages, consideration must be given to the period of time during which the loss occurs and the surface owner may elect to be paid damages in annual installments over a period of time; except that the surface owner must be compensated for harm caused by exploration only by a single sum payment. The payments contemplated by this section only cover land directly affected by drilling operations. Payments under this section are intended to compensate the surface owner for damage and disruption.

N.D.C.C. § 38-11.1-04. The determination of damages is to initially be made by the parties based upon a mutually-agreeable formula, i.e., a settlement agreement. If the parties are unable to agree on the damages to be awarded, the surface owner may sue for damages as DCR has done in this case. Murphy v. Amoco Prod. Co., 729 F.2d 552, 554 (8th Cir. 1984). If the damages awarded exceed the amount offered by the mineral developer, the surface owner can recover costs and reasonable attorneys' fees. Id. (citing N.D.C.C. § 38-11.1-09). Both parties have demanded a jury trial and the trial is scheduled to commence on October 29, 2012. The surface owner's claim for

damages under Chapter 38-11.1 remains. It will ultimately be left to a jury to determine the appropriate amount of damages associated with Fidelity's drilling activities if the parties are unable to resolve their differences. This Court has noted in the past that the damages recoverable under N.D.C.C. 38-11.1-04 are broad in scope.

### III. CONCLUSION

The Court has carefully reviewed the record, the parties' briefs, and relevant case law. The Court finds that no genuine issues of material fact exist concerning the existence of a contract, and that Fidelity is entitled to judgment as a matter of law on the breach of contract claim. The Court **DENIES** DCR's partial motion for summary judgment (Docket No. 13), and **GRANTS** Fidelity's motion for partial summary judgment on the breach of contract claim (Docket No. 21). The claim for damages under Chapter 38-11.1 of the North Dakota Century Code remains.

**IT IS SO ORDERED**.

Dated this 10th day of May, 2012.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court